UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KERRIC W. LEITZ,

                        Plaintiff,           Case No.: 11-cv-10203

        v.                         Honorable Bernard A. Friedman
                                       Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____/

### REPORT AND RECOMMENDATION
### ON COMMISSIONER'S MOTION FOR SUMMARY
### JUDGMENT [11] AND LEITZ'S MOTION FOR REMAND [10]

Plaintiff Kerric Leitz brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Defendant Commissioner has filed a Motion for Summary Judgment [11], while Leitz has filed a Motion to Remand [10]. Both motions have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.**      **RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") correctly applied the law and his decision is supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Leitz's motion [10] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.      **REPORT**

A.      **Procedural History**

On August 14, 2007, Leitz filed an application for DIB, alleging disability as of April 25, 2007.  (Tr. 108-109).  The claim was denied initially on October 24, 2007.  (Tr. 56-60).  Thereafter, Leitz filed a timely request for an administrative hearing, which was held on November 16, 2009, before ALJ Elliott Bruce.  (Tr. 37-54).  Leitz, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Judith Findora.  (*Id.*).  On January 21, 2010, the ALJ found that Leitz was not disabled.  (Tr. 6-21).  Leitz retained new counsel and on November 20, 2010, the Appeals Council denied review.  (Tr. 1-3).  Leitz filed for judicial review of the final decision on January 17, 2011.  [1].

B.      **Background**

1.      *Disability Reports*

In a disability report filed on August 14, 2007, Leitz reported that the condition limiting his ability to work was "[A]mputation of right arm.  My right arm was amputated right below the shoulder . . . I was right handed and am trying to start using my left hand more but because of pain it is very hard and impossible to do many things that I did do."  (Tr. 127).  Leitz reported that his amputation affected his ability to work because it was difficult to lift or carry things with one arm and he was having difficulty wearing his prosthesis to assist in lifting or carrying.  He reported being in pain and being fatigued by his medications, and that he was depressed by his inability to participate in the activities he used to enjoy.  (*Id.*).  Leitz reported seeing several doctors, including Dr. Brian Kelly, whom Leitz reported as being responsible for "all of my care," Dr. Renato Lee, his family doctor, and Dr. Mary Theisen-Goodvich at the Spine Program, who he saw for depression.  (Tr. 129-30).  He reported taking Cymbalta for depression and

2

sleeping problems, which made him tired, Gabepentin for nerve pain, Hydrocodone for pain, which made him tired, and Topamax for muscle spasms.  (Tr. 135).

On a function report dated September 25, 2007, Leitz reported that his daily activities included getting up to take his medicine, attending physical therapy three times a week, then coming home, taking medication, laying down and watching television until his wife got home, eating dinner, watching more television and going to bed.  (Tr. 140).  He reported that he had difficulty with personal care in that he could not button clothes, could not wash his left arm or back and had difficulty cooking or preparing food.  (Tr. 141).  He generally prepared only sandwiches, and he completed some household chores like vacuuming and dusting, but could not wash dishes, fold laundry or perform yard work, and he could not write out checks because he could not write well enough with his left hand.  (Tr. 142-43).  He did report being able to drive.  (Tr. 143).

Leitz reported that his hobbies were hunting, fishing, yard work and boating, in which he used to engage two to three times a week, but could do no longer.  (Tr. 144).  He reported engaging with people only at his doctor appointments, feeling lonely most days, and needing reminders to go to appointments, as well as to take his medication.  (Tr. 142; 144-45)  He stated that his memory was impaired since the accident.  (Tr. 144).  Leitz reported that he had difficulties lifting, reaching, and using his hands, and also with his memory, completing tasks, concentration, and understanding.  (Tr. 145).  He reported that his ability to pay attention depended on the day and that "some days" were "ok."  (*Id.*).

Leitz reported that his artificial limb was too painful for him to wear despite attempts to ensure a correct and painless fit.  (Tr. 147).  He also reported that "phantom pain" in his arm prevented him from sleeping, as did some of his medications.  (Tr. 141).  He reported being

overly afraid of another accident happening.  (Tr. 146).  On the same date as Leitz's report, his wife filled out a third-party function report, essentially reiterating what Leitz reported above. (Tr. 148-60).

In a disability appeals report, filed on December 13, 2007, Leitz reported that he was still unable to wear his prosthesis and, in addition, he had suffered a herniated disc in his back and neck, causing him severe pain and preventing him from using his left hand "much".  (Tr. 165; 168).   In addition to the medications previously listed, Leitz reported taking Lyrica and Neurontin, both for pain.  (Tr. 167).

In a "recent medical treatment" form, dated November 2, 2009, Leitz reported that he had seen Dr. Kelly as well as a Dr. Paul LeClair.  (Tr. 174).  He reported that he had "missed [his] window of opportunity to adapt well to [his] prosthesis because of pain issues."  (*Id.*).  He reported that he would continue to have issues and pain in his left arm, shoulder and neck due to overuse of his left side.  (*Id.*).  Leitz reported an additional medication, Lexapro, prescribed by Dr. Kelly to enhance his mood.  (Tr. 176).

### 2.    *Plaintiff's Testimony*

At the hearing, Leitz testified that he was married and living in a house with his wife who was laid off at the time of the hearing.  (Tr. 41-42).  He graduated from high school but had no further education.  (Tr. 42).  Leitz testified that his right arm was amputated after a failed attempt to reattach it following an accident.  (Tr. 42-44).  Prior to that time he was right-hand dominant, but since the accident had become left-hand dominant.  (Tr. 42).  He testified that he had had two prostheses since the amputation, one that was body-operated and a new one that was myoelectric, meaning that it was triggered by the remaining muscles in his arm.  (Tr. 43-44).  Leitz testified that the body-operated prosthesis did not work well and was painful because of the state of his

4

residual limb.  (Tr. 44).  He testified that the myoelectric prosthesis worked better, but did not function above table level because of the shortness of his residual limb.  (*Id.*; Tr. 46).  Leitz testified that there was still phantom pain, as well as pain at his amputation site.  (Tr. 45; 47-48). Leitz testified that he also had pain on his left side in his arm, elbow, neck and back, as well as tendonitis and arthritis, for which his doctor said surgery would be the next step.  (*Id.*).  He testified that he still took medicine for the pain.  (Tr. 46).  Leitz also testified that he had just finished a course of physical therapy and that he had also had therapy related to his prosthesis. (Tr. 45).  When asked about the functionality of his prosthesis, Leitz testified that he could not manipulate the fingers on his prosthesis, that he could only lift "very light objects" with it, and that it could be used to steady "some objects, sometimes."  (Tr.45-46).  He testified that he had a driver's license and drove approximately four hours  a week.  (*Id.*).

Leitz testified that he also suffered from depression and was being treated for it, including with medication.  (Tr. 46-47).  He testified that he formerly was in treatment every week, but now is treated once every three months.  (Tr. 46).  When asked how the treatment was going, he answered, "Every day's a challenge."  (*Id.*).  He testified that his depression negatively affected his ability to concentrate, as well as his memory.  (Tr. 47).  Leitz testified that the side effects of his medication were disruptive sleep, which left him tired and often napping during the day.  (Tr. 47-48).

### 3.   *Medical Evidence*

#### a.   *Treating Sources*

On April 25, 2007, Leitz was working with industrial equipment when his jacket became entrenched and his right arm was almost completely severed around the mid-humerus level.  (Tr. 179).  Doctors attempted to reattach the limb, extracting a vein from Leitz's leg, but his body

rejected it, resulting in temporary kidney failure. (Tr. 183-190). Ultimately, on April 30. 2007, his right arm was amputated. (Tr. 191-96).

In June 2007, Leitz was fitted with a body-operated prosthesis (Tr. 230-31). During the fitting, it was noted that Leitz had significant pain upon light touch of the distal bone on his amputated arm, which the prosthetist was unable to alleviate, and which resulted in limited range of motion. (Tr. 231). This pain continued through his follow-up appointment, and the prosthetist noted that the shortness of Leitz's residual limb made it difficult to distribute pressure from the region of his pain. (Tr. 232). However, by the end of the appointment, Leitz was able to operate his prosthesis. (*Id.*). When his pain did not subside at a subsequent appointment, he was referred to an upper extremity clinic. (Tr. 223).

At an appointment on June 1, 2007, with his family physician, Dr. Renato Lee, Leitz reported continuing phantom pain in his right arm. (Tr. 242). Dr. Lee increased his dosage of Neurontin and referred him to a pain clinic. (*Id.*). On June 12, 2007, Leitz reported to Dr. Lee that he was having a lot of depression, had a psychologist appointment at the end of July, but wanted some medication to start immediately. Dr. Lee prescribed Cymbalta and asked Leitz to report back on its efficacy. (Tr. 240; 248).

On June 13, 2007, Leitz was referred to psychologist Mary Theisen-Goodvich, Ph.D. of rehabilitation psychology for "adjustment reaction." (Tr. 286-87). Leitz reported that he had a good childhood and good relationship with his family. (Tr. 286). He had been married for four years to his current wife and she had taken a lot of time off of work recently to aid in his recovery – helping him dress and driving him to appointments. (*Id.*). Leitz reported anger and anxiety with poor mood and poor sleep, which he attributed to both pain and depression. (*Id.*). He reported that his phantom pain was not well-controlled, that he had poor appetite and energy,

and had difficulty concentrating and making decisions. (*Id.*). He reported not enjoying going out because of the way people would look at him although his wife was trying to get him into more social situations because it was good for him. (Tr. 286-87). Leitz denied suicidal or homicidal thoughts, denied panic symptoms, nightmares, flashbacks, or intrusive thoughts or memories. (Tr. 287). He reported feeling more vulnerable and less in control. (*Id.*). Upon examination, Dr. Theisen-Goodvich noted that Leitz displayed depressive affect and was tearful at times. (Tr. 286). She found while he did exhibit some trauma symptoms, it did not rise to the level of post-traumatic stress disorder ("PTSD"). (*Id.*). She found he had good support from his family, but would benefit from psychotherapy and possibly from some psychotropic medication. (*Id.*).

On June 14, 2007, Leitz was treated by Dr. Brian Kelly, D.O., at the upper extremity clinic. (Tr. 356). Upon examination, Dr. Kelly noted that Leitz had a decreased range of motion at his right shoulder, but that his shoulders were symmetrical. (*Id.*). Dr. Kelly noted that Leitz would be evaluated in order to return to driving, and that he would also be off work for three months on disability. (*Id.*). Dr. Kelly noted that Leitz would participate in occupational and psychological therapy, and he increased Leitz's dose of Neurontin. (*Id.*).

Leitz missed an appointment with Dr. Theisen-Goodvich, apparently because he was concerned about confidentiality and wanted a male psychologist closer to home. (Tr. 288). However, he saw Dr. Theisen-Goodvich again on July 12, 2007, where the confidentiality issue was discussed (his records were being sent, with his prior consent, to worker's compensation). (Tr. 289). At this appointment, Leitz's wife reported that she felt the Cymbalta had improved his mood, although he had been irritable recently likely because there were a number of physical tasks that he could not do. (*Id.*). Leitz reported that his anxiety and sleep were improving thanks

to help from his friends and family. (*Id.*). He also reported that he was less anxious when people looked at him while he was out in public. (*Id.*). Dr. Theisen-Goodvich found Leitz guarded at the appointment, and concluded that while further therapy would be beneficial, she was not sure he would continue. (*Id.*). She gave him a referral for another therapist closer to his home if he wished. (*Id.*). Leitz also apparently saw Dr. Kelly again on July 12, 2007, but there are no notes for that appointment. (Tr. 313). On July 25, 2007, Leitz reported back to Dr. Lee that the Cymbalta was helping, and that he was coping but struggling in physical therapy and counseling. (*Id.*). Dr. Lee increased Leitz's dose of Cymbalta. (*Id.*).

Dr. Theisen-Goodvich treated Leitz again on July 26, 2007. At this appointment, Leitz reported that he was being evaluated for a driver's license and was eager to get it so he could be more independent. (Tr. 290). Leitz and his wife reported that "overall his mood is not bad," though there are a few days "here and there." (*Id.*). Leitz reported getting out of the house more and doing enjoyable activities. (*Id.*). Leitz did not see Dr. Theisen-Goodvich again, however, because she had to take an unexpected leave of absence. (Tr. 291).

Dr. Theisen-Goodvich's replacement was Dr. Abby Howard, Ph.D., supervised by Dr. Randy Roth, Ph.D. (Tr. 292). Dr. Howard noted that Leitz's mood was more stable since getting his driver's license, and that Leitz reported increased energy, motivation, socialization and decreased isolation, anxiety and sadness. (*Id.*). She noted that Leitz had not been compliant with his occupational therapy requirements and was not wearing his prosthesis daily. (*Id.*). Dr. Howard encouraged Leitz to wear it at least fifteen minutes a day. (*Id.*). Despite the fact that it appears from the notes of Dr. Kelly that Leitz continued to see Dr. Howard beyond this point, there are no additional notes from Dr. Howard in the record. (Tr. 343-44; 347).

At an appointment on August 9, 2007, Dr. Kelly noted that Leitz had begun aggressive

8

outpatient physical therapy and had gained 60 degrees in active range of motion and 10 degrees of shoulder flexation and abduction. (Tr. 353). Leitz reported that he had not been wearing his prosthesis regularly and, despite an x-ray and ultrasound of his residual limb, Dr. Kelly could not find a "smoking gun" for his pain. (*Id.*). Dr. Kelly noted that Leitz's Cymbalta dose had been increased, as well as his Neurontin dose, with little improvement. (*Id.*). Upon speaking to Dr. Theisen-Goodvich, Dr. Kelly learned that the therapy sessions were "going well." (*Id.*). He increased Leitz's Topamax dosage to combat his phantom limb pain, and then noted that he spoke to Leitz's workers' compensation case manager, stating that he did not feel Leitz would be full maximum medical improvement ("MMI") until June 2008, at which time he could likely lift no more than 10-15 pounds bilaterally. (Tr. 354). Dr. Kelly noted that he would order a functional capacity examination prior to Leitz's return to full time work to delineate permanent restrictions. (*Id.*). Dr. Kelly filled out paper work that would allow Leitz to use a crossbow for hunting in the fall. (*Id.*).

At an appointment on September 13, 2007, Dr. Kelly again noted Leitz's improvement with physical therapy. (Tr. 351). He also learned that Leitz was not being fully compliant with his medication, but that this was "not due to anything[,] that the pain is somewhat improving and he forgets to take [it]." (*Id.*). Leitz reported wishing to be off medication and would sometimes go several days without it. (*Id.*). At this point, Leitz had regained his driver's license and he also reported a good connection with his therapist, and was benefitting from the sessions. (*Id.*). Dr. Kelly requested that Leitz resume his medications and prescribed him Norco for breakthrough pain. (*Id.*). He also noted that Leitz would continue with adjustment therapy and that he would still not likely reach full MMI until the following June, at which point he would be able to lift 10-15 pounds frequently but with no overhead activity. (Tr. 351-52). Dr. Kelly saw

9

Leitz again on September 27. 2007, to discuss his continued phantom limb pain.  (Tr. 350).  He cut Leitz's Neurontin in half and began him on Lyrica, stating some patients respond better to it. (*Id.*).

At an appointment with Dr. Lee on December 6, 2007, Leitz reported neck pain with radiculopathy.  (Tr. 314).  Dr. Lee noted a history of degenerative disc disease in his cervical and thoracic spine issues with multiple level disc involvement.  (*Id.*).  Leitz admitted he had not been to the pain clinic Dr. Lee had recommended, and stated that physical therapy was not helping. (*Id.*).   Dr. Lee diagnosed him with degenerative disc disease in his cervical spine with radiculopathy, again referred him to the pain clinic, and prescribed him etodolac.  (*Id.*).

At an appointment on December 13, 2007 with Dr. Kelly, Leitz reported that he was wearing his prosthesis some days 1-2 hours, and other days not at all.  (Tr. 347).  Dr. Kelly noted that Leitz might benefit from a myoelectric prosthesis instead of his body-operated one and noted that Leitz was still working with his adjustment therapist, at this point Dr. Abby Howard, to improve his adjustment to his disability and a greater attachment to his prosthesis.  (*Id.*).  Dr. Kelly noted continuing pain in Leitz's residual limb as well as phantom pain.  He was taken off Lyrica, kept on Neurontin, Cymbalta and Vicodin, but taken off all other medications.  (*Id.*).  At an appointment on February 28, 2008, Leitz reported that he was wearing his prosthesis 2-3 hours a day three days a week, specifically at physical therapy.  (Tr. 344).  He was continuing his adjustment therapy as well.  (*Id.*).  Dr. Kelly noted that he spoke with Dr. Howard who said Leitz was exhibiting vegetative symptoms in line with a depressive reaction response.  (*Id.*).  Dr. Kelly found that, after some modifications, Leitz was able to wear his socket without any additional pain, and he had also seen a reduction in his phantom limb pain.  (*Id.*).  Dr. Kelly noted Leitz was "excited to tell me about a recent fishing trip to Canada," and despite having trouble with his

10

prosthesis, "[h]e did use it to clean fish on his recent trip, but prefers to use his myoelectric Utah arm." (*Id.*). Leitz reported tingling down the left arm, and Dr. Kelly noted a positive Spurling's sign with discomfort at the neck, most notably at C4-C7. (Tr. 345). Despite the fact that at his last appointment Dr. Kelly had taken him off Lyrica, Leitz had continued to use it, and at this appointment had reported that it was helping. Dr. Kelly agreed to continue it and again wean him off Neurontin. (Tr. 344).

On April 24, 2008, Dr. Kelly noted that Leitz had increased the wearing of his prosthesis to 2-4 hours a day, and was "journeying more out in the yard and around his house" with it. (Tr. 342). Dr. Kelly noted "less vegetative symptoms and a minimal depressive reaction response" as well as "some symptoms consistent with PTSD." (*Id.*). Dr. Kelly noted that Leitz was going to have his last adjustment counseling session, and would continue with adjustment therapy thereafter on an as-needed basis. (Tr. 343). Dr. Kelly also reduced Leitz's physical therapy to one visit every two to three weeks to make sure he was holding his improvements. (*Id.*). Dr. Kelly discontinued Leitz's Vicodin, Neurontin and Topamax, keeping him on Cymbalta, Lexapro and Lyrica only. (Tr. 342).

On July 24, 2008, Leitz again saw Dr. Kelly. At this appointment the doctor noted that Leitz had increased the usage of his prosthesis to 8-10 hours a day on a consistent basis, and he even wore it to do yard work, which caused him to break it. (Tr. 340). Dr. Kelly noted that Leitz continued to take Cymbalta, as well as Lyrica and Lexapro, and his phantom pain was generally controlled. (*Id.*). Leitz reported socializing with friends more and trying to incorporate his prosthesis into his life. (*Id.*). Dr. Kelly noted a brighter affect and animated discussion of Leitz's social activities. (*Id.*). He also noticed an increased range of motion and, as a result, discontinued occupational therapy. (Tr. 340-41). He noted that Leitz would use his body-

powered prosthesis while the myoelectric one was being fixed.

On December 1, 2008, Leitz was examined by Dr. Paul LeClair, M.D. at the referral of Dr. Lee for the pain in his neck and left arm. (Tr. 333-34). Leitz reported overusing his left arm out of necessity, and that Lyrica helped somewhat with the neuropathic phantom pain in his right arm, but that he also took 3-4 Vicodin a day, which had become less effective over time. (Tr. 333-34). Upon examination, Dr. LeClair assessed possible cervical nerve root impingement and possible rotator cuff impingement. (*Id.*). He increased Leitz's Lyrica dose, ordered MRIs of his cervical spine and left rotator cuff, and considered additional physical therapy for Leitz's left side. (Tr. 334). The MRI of Leitz's rotator cuff showed some bursitis, muscular hypertrophy consistent with right arm amputation, but no other abnormalities. (Tr. 335). The MRI of Leitz's cervical spine demonstrated normal findings at C2-C3, minimal bulging at C3-C4 without spinal stenosis, but a "moderate sized left paracentral herniated nucleus pulposus" at C4-C5 with "mild spinal stenosis." (Tr. 336). The MRI also noted "mild bilateral neural foraminal stenosis" at C5-C6 and C6-C7, due to uncinate hypertrophy as well as mild bilaterally neural foraminal stenosis at C7-T1. (*Id.*). At a follow-up appointment with Dr. LeClair on January 9, 2009, the doctor noted that while Leitz's previous MRI, taken in 2006, had noted a minimal disc bulge at C3-C4 and C4-C5, the new MRI documented a herniation at C4-C5 that was not present in 2006. (Tr. 331). Dr. LeClair gave Leitz a cortisone injection and arranged a course of physical therapy. (*Id.*).

Leitz was assessed by a therapist on December 4, 2008 at the Saginaw Psychological Services for treatment purposes. He reported his problems were a traumatic accident where he lost his right arm and that his problem was "severe." (Tr. 359). He reported no suicidal or homicidal thoughts, but did report other unspecified risk-taking behaviors or concerns. (*Id.*).

Leitz reported the following symptoms: sad/depressed mood, decreased energy, hopelessness, changes in sleeping patterns, difficulty concentrating and irritability. (*Id.*). Leitz reported that he had close friends that he saw weekly and that his leisure activities included fishing, hunting and boating. (Tr. 361). The therapist, based on Leitz's reporting, noted strengths in several categories including mental/emotional, psychiatric, social/interpersonal relationships, and leisure activity. (Tr. 365-66). She noted needs in two areas, medical (due to Leitz's herniated discs and his use of pain medication) and adjustment to disorder/disability (due to his need for marital improvement and the way he responds to others who are outsiders). (Tr. 366). Leitz reported that he had finished therapy with the doctors in Ann Arbor and wanted to "preserve the ground he's gained." (Tr. 369). He was diagnosed with a mood disorder due to amputation and assessed a GAF score of 59. (*Id.*). However, the therapists at the clinic closed Leitz's case after his initial consultation because he cancelled once, was a no-show twice, and was unreachable by phone. (Tr. 357). In his outtake form, the therapist noted that Leitz's prognosis was "guarded." (*Id.*).

Dr. Kelly saw Leitz again on December 11, 2008. (Tr. 339). At that appointment he noted that Leitz had been using his body-powered prosthesis on an intermittent basis, mostly to do yard work, dress venison or clean the fish he caught, but that he used the myoelectric one on a consistent basis. (*Id.*). Dr. Kelly noted the switch to Lyrica had been "very helpful" and that Leitz no longer required any Neurontin. (*Id.*). Leitz reported less vegetative symptoms with minimal depressive reaction response, and continued to take Cymbalta and Lexapro. (*Id.*). Leitz's wife reported that he was doing well and was active around the house. (*Id.*). She also reported that Leitz had met with his new psychologist only one time. (*Id.*). Dr. Kelly noted a brighter affect and increased animation when Leitz spoke of his social and hunting activities. (*Id.*). He found some minor problems with Leitz's prosthesis that were being corrected, but

13

overall did not change his regimen.  (*Id.*).  At a follow-up appointment on February 26, 2009, Dr. Kelly noted that Leitz continued to wear his prosthesis close to 8 hours a day, on a frequent and consistent basis, and he reported no new vegetative symptoms after getting a new puppy.  (Tr. 338).  Upon examination, Dr. Kelly noted a bright affect and no loss of range of motion.  (*Id.*).  Dr. Kelly made no changes to his medicine regimen and made no notes about any psychological treatment.  (*Id.*).

Leitz completed his physical therapy on February 10, 2009, attending eleven out of twelve sessions.  (Tr. 327).  His therapist noted that Leitz had "done quite well" and had "met all the goals."  (*Id.*).  The therapist noted that Leitz reported "significant reduction in pain while fishing, driving, reaching overhead, lifting, etc.," and that he "denies any functional limitations due to neck or shoulder pain."  (*Id.*).  At a follow-up appointment with Dr. LeClair on February 20, 2009, Leitz reported significant improvement with the cortisone injection and moderate improvement with his physical therapy.  (Tr. 325).  Dr. LeClair found that no additional cortisone treatments were necessary at that time, and that Leitz should continue with the home exercise program prescribed.  (*Id.*).  Dr. LeClair also prescribed Ultram to use instead of Vicodin for pain.  (*Id.*).

       *b.*     *Consultative and Non-Examining Sources*

On October 23, 2007, Dr. Jack Kaufman, M.D. assessed Leitz's physical RFC based on examination of the record.  (Tr. 295-303).  He found Leitz capable of lifting 20 pounds occasionally, 10 pounds frequently and walking, standing or sitting six hours in an eight hour day. (Tr. 296).  He had unlimited ability to push or pull.  (*Id.*).  Dr. Kaufman noted that his RFC projection was for "one hand dominant work with ability to use prosthetic assistance." (*Id.*).  He found that Leitz was limited in his ability to reach, handle, finger or feel.  (Tr. 297-98).  Dr.

14

Kaufman noted that substantial gainful activity would need to be "of a nature to accommodate a one arm dominant worker." (*Id.*).

On May 6, 2009, Leitz was referred to Dr. Todd Kuiken for a physical evaluation by one of his treating doctors. (Tr. 371). Leitz reported feeling anxious and having some difficulty sleeping. (*Id.*). He reported that he still had phantom limb pain that was mostly 5 out of 10, with occasional "shooters." (*Id.*). He reported that he was working with pain management therapists and that he was not wearing his prosthesis as much as he did before it broke and took several months to fix. (*Id.*). Leitz reported no longer seeing a psychologist or psychiatrist. (*Id.*). Leitz reported that he was not working and "is not too interested in working." (Tr. 372). His hobbies included hunting, fishing, boating, and outside activities. (*Id.*). He walked his dog for exercise and was driving as well. (*Id.*). Upon examination, Dr. Kuiken noted that Leitz had a full range of motion in his left arm, had abduction to about 110 degrees and was able to flex close to normal in his right residual limb. (*Id.*). Dr. Kuiken concluded that Leitz would be a good candidate for reinnervention and could be refitted as a shoulder disarticulation amputee, as he had been wearing his myoelectric prosthesis regularly before. The doctor suggested shortening Leitz's humerus a bit more to get rid of a painful boney prominence, and noted that Leitz would be visiting with plastic surgery and a prosthetist later that same day. (*Id.*). There are no further notes regarding the outcome of this recommendation.

c.    *New Evidence*

Leitz submits with his motion for remand a number of records of treating therapist Suzanne Bowns, along with a deposition transcript of her testimony taken on May 6, 2011. (Plf. Brf. Exh. 1, p. 26-76). From the records it appears Ms. Bowns treated Leitz from March 18, 2009, through at least April 14, 2011, comprising approximately 77 appointments. (*Id.* at 54-76).

15

Her initial assessment documented that Leitz had periods of uncontrollable crying 2-5 times a day, difficulty sleeping with daytime napping, angry outbursts, loss of interest, some suicidal ideation, constant pain in his shoulders, phantom pain and loss of libido.  (*Id.* at 51-52).  Ms. Bowns noted that Leitz's motor activity was agitated, his mood depressed and he had difficulty concentrating and remembering.  (*Id.* at 52).  She noted normal speech and thought process, that Leitz denied suicidal or homicidal thoughts, had no hallucinations or delusions, was oriented to person, place and time, but had impaired memory.  (*Id.*).  She diagnosed Leitz with major depressive disorder, severe without psychotic features, and assessed him with a GAF score of 50.  (*Id.*).

Ms. Bowns's treatment notes for each subsequent appointment are very short and extremely consistent in their content.  In almost all of them, Leitz's mood symptom is characterized as "depressed" with an occasional "difficulty concentrating," "lethargic," "anger," or "loss of interest" interspersed throughout.  (Tr. 54-76).  His presentation notations are similar, generally "depressed," "anger outbursts," "tearful," low concentration, "downcast eyes," "withdrawn," and "sullen."  (*Id.*).  His strengths are almost always "motivation" and his weaknesses "pain."  (*Id.*).  His presentation at the end of the session is almost always "depressed but stable."

In her deposition, Ms. Bowns testified that she was a clinical social worker with a Master's degree.  (Plf. Brf. Exh. 1 at 29).  She testified that when she first met Leitz he complained of uncontrollable crying which could happen three to five times a day.  (*Id.* at 30).  He also reported having difficulty staying awake three of seven days per week.  She testified that on those days he would get up, take his medication, and lay down on the sofa until it was time for him to go to bed.  (*Id.*).  Ms. Bowns noted that Leitz's other symptoms included loss of

libido, helplessness, and, at times, suicidal feelings and angry outbursts.  (*Id.* at 31).  Ms. Bowns testified to seeing his angry outbursts firsthand at "nearly every session."  (*Id.* at 31-32).  She testified that Leitz would have angry outbursts at everyone in his family and that he could become verbally assaultive with anyone for no apparent reason.  (*Id.* at 33).  Ms. Bowns testified that Leitz's concentration was impaired as well, and that he was in constant pain.  She testified that several times a session he would lose his train of thought.  (*Id.* at 43).  She testified that since his initial assessment, she has added a diagnosis of PTSD to his list of conditions based on his symptoms.  (*Id.* at 35-36).  Ms. Bowns testified that Leitz's GAF score has gone from between 45-50 during the time she has treated him, but has never been higher than 50.  (*Id.* at 38).  She testified that it was clear when she began treating him that his depression was not new, but had "lingered since the time of the traumatic amputation."  (*Id.*).  She testified that despite the therapies she has engaged in with Leitz, he has reported little change in his condition.  (*Id.* at 39).  She testified, however that she had seen a slight decrease in his uncontrollable crying and his fidgeting since he had been put on psychotropic medications, which she testified occurred in September of 2010.  (*Id.* at 42).  When asked if she felt Leitz met the conditions for disability listing 12.04, affective disorders, she testified that he did in that he had a pervasive loss of interest in activities, sleep and appetite disturbances, psychomotor agitation, decreased energy, feelings of worthlessness, difficulty concentrating and occasional thoughts of suicide.  (*Id.* at 45-46).  She further testified that he had marked restrictions in his activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence and pace.  (*Id.* at 46-47).  She testified that his prognosis was "poor."  (*Id.* at 47).

       *4.*    *Vocational Expert's Testimony*

VE Judith Findora testified that Leitz's prior relevant work was classified as medium unskilled in nature. (Tr. 50). When asked whether there were jobs at the light exertion level that were "essentially one armed jobs," the VE testified "not really," but that there were some "that could be accommodated." (*Id.*). The ALJ then posed the following hypothetical: light exertion jobs that require no more than frequent grasping with the non-dominant arm. (*Id.*). The VE testified that there were approximately 120,000 national sales positions that would fall within that restriction. (Tr. 51). She further testified that there were approximately 300,00 machine operator positions also satisfied this requirement, including a limitation to only gross motor skills on the non-dominant arm. (Tr. 51-52). Finally, she testified that there were approximately 80,000 inspector jobs that fit these criteria as well. (Tr. 52). When questioned, the VE testified that these jobs would allow approximately one excused absence a month and would not permit naps or rest breaks outside of the normal break and lunch periods. (Tr. 52-53).

## C.    Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic

18

work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ determined that Leitz was not disabled.  (Tr.. 9-21).  At Step One, he found that Leitz had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 11).  At Step Two, he found Leitz had the following severe impairments:  "residual effects of the amputation of the right arm."  (Tr. 11-12).  He did not classify Leitz's alleged depression as a severe impairment, finding "no persuasive evidence to establish mental health impairments which impose more than minimal functional limitations or otherwise preclude the ability to perform unskilled work" and that "these non-severe impairments fall far short of meeting the criteria of listed impairments 12.04, Affective Disorders, or 12.06, Anxiety related disorders . . .with respect to either the presence of the

19

symptoms specified in part A or the level of severity specified in part B of the listings." (Tr. 12). At Step Three the ALJ determined that Leitz's physical impairment did not meet or medically equal a listed impairment, specifically the listings under 1.00. (Tr. 12-13). The ALJ then determined Leitz's RFC: "work that does not require: exertion above the light level (20 CFR 404.1567(b)); or more than frequent grasping with the non-dominant arm; or more than gross motor skills with the non-dominant arm; or work above the waist level with the non-dominant arm." (Tr. 13). At Step Four he determined Leitz was unable to return to his prior relevant work as it was of medium exertion. (Tr. 15). Finally, at Step Five, the ALJ concluded, based on VE testimony, that Leitz was not disabled as, given his age, education, work history and RFC, he was capable of performing significant other work in the national economy. (Tr. 16).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

20

(internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.    **Analysis**

Leitz alleges that the ALJ committed several legal errors and that his opinion is not supported by substantial evidence.  Leitz first argues that the ALJ erred in not subpoenaing the treatment records of Dr. Abby Howard, and of another treating therapist, Suzanne Bowns,

despite the fact that the latter therapist was not identified anywhere in the administrative record. Leitz also argues that, based on his mental condition, the ALJ erred in not ordering a consultative mental examination and RFC assessment.   Third, Leitz argues that the ALJ erred in not considering the effects of his medications on his ability to do work functions.   Leitz argues that the ALJ could not rely on the VE's testimony because it was not based on a hypothetical question that included all of his limitations.   Finally, Leitz argues that this case should be remanded back to the ALJ to consider the treatment notes of therapist Bowns and of Dr. Howard because that evidence is both new and material to a determination of disability.[1]

### 1.   ALJ's Duty to Subpoena Treatment Records

Leitz first argues that the ALJ had a duty to develop the record in his case, and this included a duty to subpoena the treatment records of Dr. Abby Howard, one of Leitz's psychologists, as well as therapist Suzanne Bowns, whose identity appears nowhere in the administrative record.

At the end of the hearing, the ALJ noted to Leitz's then-counsel that there were no medical records in the file that extended beyond twelve months from the alleged onset date, and that he had mailed counsel a letter to that effect requesting any additional records, to the extent they existed.  (Tr. 53).  The ALJ further stated: "[i]f there are records out there and you want me

---

[1] Leitz also makes an undeveloped argument that the ALJ erred in not following the procedural requirements of 20 C.F.R. § 404.1520a, for the reasons stated in his other arguments.  Because Leitz failed to develop this argument, the court cannot ascertain the precise basis for his claim, as his other claims of error do not directly apply to the requirements of §404.1520a, which delineates, among other things, the "special technique" an ALJ is required to use when assessing whether a mental impairment is severe.  While the Commissioner generously attempts to interpret Leitz's undeveloped argument, and respond to it, the court declines to address any alleged error the ALJ may have made in applying this technique because Leitz fails to articulate any basis for finding such an error.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

to see them, I recommend you submit them immediately." (*Id.*).   Counsel replied that he anticipated additional records within a week, to which the ALJ responded, "Counsel, all I can say is you've heard the testimony in this case and you've heard Ms. Findora's testimony.  I – my recommendation is that the evidence be submitted immediately." (*Id.*).  The ALJ even offered to consider an extension, but apparently one was not requested.  (*Id.*).  No additional records were submitted by Leitz's counsel.  According to Leitz's motion, his new counsel, retained at the Appeals Council stage, attempted to contact Leitz's old counsel to learn what records had been submitted to the ALJ, but his former counsel did not identify them until after the Appeals Council rendered its decision.  (Plf. Brf. Exh. 1 at 78-80).  After obtaining the list of records, Leitz's new counsel learned that Dr. Bowns's treatment records were not included, and only recently counsel discovered additional treatment records existed with Dr. Howard, which he has not yet been able to obtain.  (Plf. Mot. at 7).

Although the ALJ is responsible for ensuring the claimant a full and fair hearing, *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983), ultimately "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.3d 211, 214 (6th. Cir. 1986).  However, "under special circumstances – when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures -- an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) *citing Lashley,* 708 F.2d at 1051-52.  The court in *Wilson* held that even where a claimant proceeds without counsel, to the extent she is capable of grasping the proceedings and adequately presenting her case, no special duty is imposed on the ALJ to develop the record.  *Id.*

Here, Leitz was represented by counsel at the hearing.  Thus, the ALJ had no special duty to develop the record beyond what counsel provided, which the ALJ found sufficient to make a disability determination.  *See Rowe v. R.R. Ret. Bd.*, 114 Fed. Appx. 189, 193 (6th Cir. 2004), *citing Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986) ("the hearing officer is under no heightened duty to develop the record when a claimant is represented by counsel.").

Furthermore, it appears from the transcript that the ALJ was prepared for the hearing and not only provided Leitz with an opportunity, but encouraged him to supplement the record both before and after the hearing.  (Tr. 53); *see e.g. Burgodorf v. Comm'r of Soc. Sec.*, No. 10-13719, 2011 U.S. Dist. LEXIS 135946 at *4-5 (E.D. Mich. Nov. 28, 2011) (no heightened duty where ALJ represented by counsel, ALJ prepared for hearing and encouraged claimant to supplement record); *Ison v. Astrue*, No. 10-286, 2011 U.S. Dist. LEXIS 112009 at *20-21 (E.D. Ky. Sept. 29, 2011) (ALJ did not have heightened duty where claimant actively participated in hearing and was represented by counsel).  The court finds that the ALJ's offer to allow supplementation was not an acknowledgement that the then-existing record was insufficient to enable him to make the necessary determinations, but rather simply gave Leitz an opportunity to provide additional information for the ALJ's consideration if he wished.  Because the ALJ had no special duty to develop the record in the presence of counsel, and because the ALJ gave Leitz a full opportunity to supplement the record, the court finds no error in the ALJ's development of the record.

### 2.    *ALJ's Duty to Order a Consultative Mental Examination*

Leitz next argues that the ALJ was required to order a consultative mental examination given the evidence of his mental impairments, since the record was allegedly deficient in that respect.  As stated above, it is the claimant's duty to establish that he is disabled.  He is

"responsible for furnishing evidence that can be used to reach the conclusion that [he] is disabled." *Rise v. Apfel*, No. 99-6164, 2000 U.S. App. LEXIS 26851 at *4 (6th Cir. Oct. 13, 2000) *citing* 20 C.F.R. § 404.1512(a) *and Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Sixth Circuit has held that an ALJ is not required to order a consultative examination "unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (adopting holding in *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (emphasis in original)).

Here, the ALJ determined that Leitz's depression had no more than a minimal impact on his ability to perform work functions based on the evidence in the record, and did not preclude his ability to engage in unskilled work.  (Tr. 12).  In making that determination, the ALJ considered all of the medical evidence in the record, specifically Dr. Theisen-Goodvich's records, Dr. Kelly's notes of his conversations with Drs. Theisen-Goodvich and Howard, his own treatment records, and the evaluation of the Saginaw Psychological Services and Leitz's failure to follow-up after his initial assessment.  (*Id.*).  Dr. Kelly's notes were particularly informative as he documented continued progress in Leitz's mental condition, despite the absence of direct records of Dr. Howard, culminating in determining that Leitz need only see a psychologist on an "as-needed" basis and noting, at his last appointment of record, that Leitz reported "no vegetative symptoms."  (Tr. 338). The cases Leitz cites in support of his position are inapposite.  In *Maes v. Astrue*, the Tenth Circuit held that the ALJ should have ordered a consultative mental examination where the claimant was on Prozac but there was no evidence as to why, and the medical expert called to testify could not determine a reason.  522 F.3d 1093, 1098-99 (10th Cir. 2008).  Here, there was no mystery in the record as to Leitz's depression or its progress, as it is all documented in Dr. Kelly and Dr. Theisen-Goodvich's notes.  In addition,

*Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983) and *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) are not relevant here.  In *Warner*, the ALJ merely found that if he had not been presented with evidence of a particular condition, he "probably" would have to request a consultative exam.  And, in *Reeves*, the SSA's consulting doctor had specifically recommended an orthopedic consulting exam.  Here, the ALJ found sufficient evidence existed in the record to make a disability determination, and no need for an additional consulting exam was ever expressed to the ALJ.  Based upon this record, the ALJ was not required to order a consultative examination regarding Leitz's depression.

### 3.    Side Effects of Leitz's Medications

Leitz argues that the ALJ erred in not considering the side effects of his medications on his ability to work.  Evaluation of Leitz's symptoms under the regulations requires consideration of all subjective complaints, including, but not limited to type, dosage, effectiveness and adverse side effect of any medication taken to alleviate symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(iv).  However, unlike some of the other regulations, this regulation does not require the ALJ to explain his consideration of this factor in his written decision.  *Id.*; *see also Hale v. Comm'r of Soc. Sec.*, no. 10-10751, 2011 U.S. Dist. LEXIS 46865 at *8, 2011 WL 1641892 (E.D. Mich. May 2, 2011).

Here, the ALJ properly considered the side effects of Leitz's medications.  Leitz testified at the hearing that the side effect of his medication was "disruptive sleep."  (Tr. 47).  On his initial disability report, Leitz reported that his Cymbalta and Vicodin made him "tired."  (Tr. 135).  On his disability appeals report he noted no side effects to his medication.  (Tr. 167).  The ALJ found Leitz's testimony and reports not credible to the extent they conflicted with the RFC assessment he made.  (Tr. 13).  In addition, there is no notation in any of the medical records that

Leitz ever complained about the side effects of his medications to his doctors, or that his doctors adjusted his medications because of tiredness or disruptive sleep.  Therefore, the ALJ properly considered Leitz's medications' side effects and found that they did not interfere with his ability to do work as classified in the ALJ's RFC assessment.

### 4.    ALJ's Reliance on Vocational Expert Testimony

Leitz argues that the ALJ erred in relying on the VE's testimony because it was not based on a hypothetical that included all of his limitations.  To the extent Leitz argues that the ALJ should have included limitations that he did not find credible in her decision, that argument has been sufficiently addressed in the preceding sections.  To the extent Leitz argues that the hypothetical questions posed did not include the limitations the ALJ did find, the court finds this argument unavailing.

While he perhaps could have framed them more clearly, the ALJ did ask several hypotheticals which, taken in combination, elicited testimony about the number of jobs available to someone of Leitz's age, education and vocational background who could perform light-duty work, with no more than frequent grasping with his non-dominant arm, and no use of the non-dominant arm above table-height or waist-level, and which use only gross motor skills in the non-dominant arm.  (Tr. 49-51).  The VE testified that, based on those limitations, there were a significant number of jobs in the national economy that such a claimant could perform, including sales positions (120,000), machine operator positions (300,000), or inspector positions (80,000).  (Tr. 51-52).  Because the ALJ proposed a group of hypotheticals which, in combination, took into account all of Leitz's credible limitations, and which elicited VE testimony demonstrating that Leitz could continue to perform a substantial number of jobs in the national economy, the ALJ did not err in relying on the VE's responsive testimony about the number and types of jobs

Leitz could perform.

>        5.        *Remand to Consider New Evidence*

Leitz argues that this case should be remanded back to the ALJ, pursuant to sentence 6 of the Act, to allow the ALJ to consider the treatment records of Dr. Abby Howard and therapist Bowns because that evidence is both new and material to a determination of disability. The court disagrees. Remand to consider additional evidence is appropriate only when the evidence is new and material, and good cause is shown as to why it was not presented at the prior proceeding. 42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). Evidence is "material" if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).

First, the court is unable to determine whether the treatment notes of Dr. Howard would be new or material to this case, as counsel has not provided them to the court, citing the fact that he has not yet been able to obtain them. However, even if they were new and material, (which at least the treatment notes of Dr. Bowns dating prior to the date of the administrative hearing may be, considering that her treatment started after Dr. Howard's treatment ended, and that the ALJ determined that Leitz's depression did not rise to the level of a severe impairment), Leitz has failed to demonstrate good cause for the absence of these records at the administrative hearing.

*See Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (finding that failure to satisfy "good cause" requirement prevents court from remanding case even if new evidence is deemed material); *see also Robinson v. Sec'y of Health & Human Servs.*, No. 90-2304, 1991 U.S. App. LEXIS 10743 at *6 (6th Cir. May 15, 1991) (same); *Brown v. Comm'r of Soc. Sec.*, No. 10-12960, 2011 U.S. Dist. LEXIS 136050 at *11-12 (E.D. Mich. Nov. 28, 2011) (evidence that is new and material nevertheless does not warrant remand where good cause is not established).

Leitz argues that there was good cause for the absence of these records at the hearing because his former counsel, who represented him at the hearing, was ineffective, failing to procure these records or present them to the ALJ, despite the fact that the ALJ specifically invited counsel to provide any additional records he wished to include for consideration. However, ineffective assistance of counsel does not satisfy the requirement of "good cause." *Taylor v. Comm'r of Soc. Sec.*, 43 Fed. Appx. 941, 943 (6th Cir. 2002). Leitz cites the Sixth Circuit case of *Arms v. Gardner* for the proposition that ineffective assistance of counsel requires remand. 353 F.3d 197 (6th Cir. 1965). His argument is unavailing. Unlike counsel in *Gardner*, here Leitz's hearing counsel did submit records, and did some examination of the claimant and the vocational expert. Furthermore, there may be reasons other than effectiveness that caused him to not submit the records in question -- for instance, he may have had no idea that Ms. Bowns was even treating Leitz, as Leitz never made that fact known to the ALJ or any treater or consulting physician in the record. Counsel may have also been unable to obtain Dr. Howard's notes in a timely manner, as it appears Leitz's current counsel has been unable to obtain them as well. Or he may have believed that Dr. Kelly's notes accurately reflected Dr. Howard's observations. Without some indication that counsel was actually ineffective, remand on that

point is not warranted.  *See Spoors v. Comm'r of Soc. Sec.*, No. 10-474, 2011 U.S. Dist. LEXIS 116545 at *17-18 (W.D. Mich. Sept. 8, 2011) (finding that alleged ineffective assistance of non-attorney at administrative hearing did not warrant remand where no indication that choices made constituted ineffective assistance).  Since Leitz has offered only the fact of non-production of materials, many of which appear to have existed at the time of his hearing, he has failed to demonstrate good cause for their absence, and remand on this ground is not warranted.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Leitz's Motion for Remand [10] be DENIED, the Commissioner's Motion [11] be GRANTED and this case be AFFIRMED

Dated: March 21, 2012                                    s/David R. Grand
Ann Arbor, Michigan                                    DAVID R. GRAND
                                                                     United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 21, 2012.

                            s/Felicia M. Moses_____
                            FELICIA M. MOSES
                            Case Manager